**HULLINGHORST INDUSTRIES, INC., Petitioner,**

v.

**David E. CARROLL, and Director, Office of Workers' Compensation Programs, U. S. Department of Labor, Respondents.**

**No. 80–3116.**

United States Court of Appeals, Fifth Circuit.

Unit A

July 16, 1981.

---

John Dale Powers, Michael H. Rubin, Baton Rouge, La., for petitioner.

Boris F. Navratil, Baton Rouge, La., for amicus curiae Nichols Const. Co.

Janine Syll Simerly, New Orleans, La., for Carroll.

Joshua T. Gillelan, II, U. S. Dept. of Labor, Washington, D. C., for respondents.

Before CHARLES CLARK, TATE and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

Hullinghorst Industries, Inc. appeals from a decision of the Benefits Review Board awarding benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, to David E. Carroll, an injured Hullinghorst employee. The appeal is based on two contentions:[1] First, that the Board erred in concluding that Carroll was a covered employee within the meaning of the Act, and second, that the Board erred in affirming the administrative law judge's conclusion that there was a connexity between Carroll's injury and his subsequent disability.

Our review of the record before us discloses no legal error in the Board's decision. It is, therefore, in all respects affirmed.

### Facts

This appeal is brought on undisputed facts.

David E. Carroll, the compensation claimant, suffered a back injury while erecting a scaffold beneath a pier extending out over the Mississippi River.

---

1. Hullinghorst has withdrawn a third contention, conceding it to have been "mooted" by the recent decision of the United States Supreme Court in *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980).

The pier was part of a port facility owned and operated by the BASF Wyandotte Corp. (Wyandotte) in Geismar, Louisiana. The sole purpose of the scaffold was to provide a place for Wyandotte employees to stand in order to repair a turntable (a piece of equipment used by Wyandotte in the loading and unloading of vessels) that had been damaged by a ship.

Carroll was not a Wyandotte employee and was to have no direct role in the actual repair work on the turntable. He was employed as a carpenter by Hullinghorst Industries, Inc. (Hullinghorst), which acted solely as the scaffolding subcontractor at the Wyandotte port facility. Neither Hullinghorst nor any of its employees (including Carroll) participated directly in the loading, unloading, building, repair, or breaking of any vessel. Indeed, Hullinghorst (and Carroll) did nothing but erect scaffolding for whatever purpose needed at the Wyandotte facility.

Following his injury, Carroll filed a claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., with the United States Department of Labor (DOL).[2]

Initially, the administrative law judge (ALJ) denied benefits to Carroll on the ground that he was not an "employee" within the meaning of the Act. The Director of DOL's Office of Workers' Compensation Programs appealed that decision to the Benefits Review Board (Board). The Board reversed the ALJ's determination that Carroll was not a covered employee under the Act and remanded the case for determination of the amount of compensation due.

The ALJ's determination on remand was upheld by the Board, and Hullinghorst petitions for review of the Board's final order.

## I. Scope of Review

■ The scope of our review of the Board's determinations is relatively narrow:

We are to review for errors of law, and to assure that the Board has adhered to its statutory standard of review of factual determinations. *Alford v. American Bridge Div., U. S. Steel Corp.*, 642 F.2d 807, 809 (5th Cir. 1981) (petition for rehearing pending, on denial of coverage to worker who spent some portion of his time in shipbuilding activities, but who was not engaged in shipbuilding activities at the time of his injury); *Presley v. Tinsley Maintenance Service*, 529 F.2d 433, 436 (5th Cir. 1976).

■ Under the terms of the Act, 33 U.S.C. § 921(b)(3), the findings of fact by the ALJ are "conclusive if supported by substantial evidence." The Board is thus constrained to accept the factual findings of the ALJ unless they are irrational or are unsupported by substantial evidence in the record as a whole. *Alford v. American Bridge Div., U. S. Steel Corp., supra*, 642 F.2d at 809; *Presley v. Tinsley Maintenance Service, supra*, 529 F.2d at 436. In addition, the ALJ's selection of reasonable conflicting factual inferences is conclusive upon the Board if supported by the evidence and not inconsistent with the law. *Alford v. American Bridge Div., U. S. Steel Corp., supra; Presley v. Tinsley Maintenance Service, supra.*

■ In accord with these principles, we reject at the outset Hullinghorst's contention that the Board exceeded its statutory authority in reversing the determination of the ALJ that Carroll was not a covered employee within the meaning of the Act. Under the uncontested facts, the ALJ's determination in this regard was neither a finding of fact nor a factual inference drawn from the evidence. It was a conclusion of law. As such, it was subject to reversal by the Board as legally erroneous, and is open to review by this court on appeal. It is clear from the Board's opinion that it did not in any wise reject the ALJ's findings or inferences of fact. To the con-

2. Previously, on August 8, 1975, Carroll filed suit against Hullinghorst and Wyandotte in the United States District Court for the Eastern District of Louisiana—an action dismissed for lack of subject matter jurisdiction on May 28, 1976. Carroll also filed suit in state court on February 25, 1976, seeking benefits under Louisiana's workmen's compensation statute. Those actions have no direct bearing on the issues presented to this court.

trary, it expressly accepted them and reached on that predicate a contrary legal conclusion. Such action is well within its statutory power. *See Presley v. Tinsley Maintenance Service, supra,* 529 F.2d at 436–37.

## II. Coverage

In construing the coverage provisions of the Act, 33 U.S.C. § 903(a)[3] this circuit has identified three controlling jurisdictional requirements: (1) The injured claimant must have "employee" status as defined by 33 U.S.C. § 902(3);[4] (2) his injury must have occurred on the "navigable waters" situs described in § 903(a); and (3) the claimant's employer must qualify as an "employer" within the meaning of 33 U.S.C. § 902(4).[5] *Alford v. American Bridge Div., U. S. Steel Corp., supra,* 642 F.2d at 810–11. As to (3), however, *see Trotti & Thompson v. Crawford,* 631 F.2d 1214, 1216 & n.5 (5th Cir. 1980) and discussion in text at note 8 *infra.*

It is not disputed that the situs requirement of the Act is satisfied—the injury did occur on the navigable waters of the United States, as described in § 903(a). The focus of the parties' contentions is upon Carroll's *status* as an "employee" within the meaning of § 902(3).

### a. "Employee" status.

▪▪▪ The essential element of the status requirement is that the claimant must be "engaged in maritime employment." 33 U.S.C. § 902(3). The requirement is occupational rather than geographic, *P. C. Pfeiffer Company, Inc. v. Ford,* 444 U.S. 69, 78–81, 100 S.Ct. 328, 335–36, 62 L.Ed.2d 225 (1979), and encompasses occupations beyond those enumerated in the ACt, *P. C. Pfeiffer Company, Inc. v. Ford, supra,* 444 U.S. at 77 n.7, 100 S.Ct. at 334 n.7; *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 265 n.25, 97 S.Ct. 2348, 2358 n.25, 53 L.Ed.2d 320; *Trotti & Thompson v. Crawford, supra,* 631 F.2d at 1220; *Odom Construction Co. v. United States Dep't of Labor,* 622 F.2d 110, 112 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981). In addition, "employee" status under the Act may be based *either* upon the maritime nature of the claimant's activity at the time of his injury *or* upon the maritime nature of his employment as a whole. *Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841, 844 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). *See also Texports Stevedore Co. v. Winchester,* 632 F.2d 504, 511 (5th Cir. 1980) *(en banc); Odom Construction Co. v. United States Dep't of Labor, supra,* 622 F.2d at 113. Thus, a claimant will meet the status requirement of the Act, not only if he is engaged in "maritime employment" at the time of injury, but also if he spends some portion of his overall employment engaged in maritime activities. *See, e. g., Howard v. Rebel Well Service,* 632 F.2d 1348 (5th Cir. 1980); *Boudloche v. Howard Trucking Co., Inc.,* 632 F.2d 1346 (5th Cir. 1980).

The term "maritime employment" is not defined in the Act. The basic elements of that status were articulated by this court in *Jacksonville Shipyards, Inc. v. Perdue,* 539

---

**3.** Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring on the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)....
33 U.S.C. § 903(a).

**4.** The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
33 U.S.C. § 902(3).

**5.** The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
33 U.S.C. § 902(4).

F.2d 533, 539–40 (5th Cir. 1976), *vacated and remanded in part sub nom. P. C. Pfeiffer Company, Inc. v. Ford*, 433 U.S. 904, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977), *reaff'd on remand*, 575 F.2d 79 (5th Cir. 1978) (*per curiam*), *aff'd sub nom. P. C. Pfeiffer Company, Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979):

> [A]n injured worker is a covered "employee" if . . . (a) he was performing the work of loading, unloading, repairing, building, or breaking a vessel, or (b) although he was not actually carrying out these specified functions, he was "directly involved" in such work.

*See also Thibodaux v. Atlantic Richfield Co., supra*, 580 F.2d at 844 (establishing alternative test of either time of injury or overall occupation). The *Jacksonville Shipyards* panel expressly left open the possibility of future expansion of coverage to include

> other types of . . . work which cannot be characterized as loading, unloading, repairing, building, or breaking, and which are not "directly involved" with these five types of work, but which nevertheless are sufficiently similar to fall within the Congressional scheme.

*Jacksonville Shipyards, Inc. v. Perdue, supra*, 539 F.2d at 540 n.18.

Subsequent cases have followed the *Jacksonville Shipyards* "direct involvement" test, construing it liberally in order to further the compensatory purposes of the Act.[6] Thus, coverage has been extended on the basis of "employee" status to a worker (who had never worked aboard a ship) injured while cleaning a piece of steel to prepare it for fabrication into a shipbuilding component, *Ingalls Shipbuilding Corp. v. Morgan*, 551 F.2d 61, 62 (5th Cir. 1977) (cleaning was "necessary prerequisite to the fabrication of the steel" and thus was "an essential step of the shipbuilding process"); to a worker injured while sandblasting a disassembled crane to prepare it for use in shipbuilding, *Alabama Dry Dock & Shipbuilding Co. v. Kininess*, 554 F.2d 176, 178 (5th Cir.) (repair and maintenance of machines used in shipbuilding is an "essential aspect" of the shipbuilding business), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977); to a worker who maintained and repaired tools and equipment used in loading and unloading ships, *Texports Stevedore Co. v Winchester*, 554 F.2d 245, 247 (5th Cir.) (maintenance and repair of longshoring tools and equipment is a "continuous and direct involvement with maritime activities"), *modified in part on rehearing on other grounds*, 561 F.2d 1213 (5th Cir. 1977), *aff'd on rehearing en banc on other grounds*, 632 F.2d 504 (5th Cir. 1980); to a landbased construction worker injured while removing concrete blocks used as moorings from navigable waterway, *Odom Construction Co. v. United States Dep't of Labor, supra*, 622 F.2d at 113 (removal of blocks "directly furthered maritime commerce" and had "realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters' . . . ."); and to a landbased carpenter injured while working on the initial construction of a pier, *Trotti & Thompson v. Crawford, supra*, 631 F.2d at 1220 (claimant's work "directly furthered" the maritime goals of the port, and initial construction cannot be distinguished from pier repair under the Act).

■ These decisions are dispositive of the status issue raised on this appeal. This court has made it clear that the maintenance and repair of tools, equipment, and facilities used in indisputably maritime activities lies within the scope of "maritime employment" as that term is used in the Act. *Odom Construction Co. v. United States Dep't of Labor, supra*, 622 F.2d 110 (5th Cir. 1980) (restoration of mooring facil-

---

**6.** *E. g., Texports Stevedore Co. v. Winchester*, 554 F.2d 245, 246 (5th Cir.), *modified in part on rehearing on other grounds*, 561 F.2d 1213 (5th Cir. 1977), *aff'd on rehearing en banc on other grounds*, 632 F.2d 504 (5th Cir. 1980) (*en banc*); *Alabama Dry Dock & Shipbuilding Co. v. Kini-* ness, 554 F.2d 176, 178 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977). *See Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 268–72, 97 S.Ct. 2348, 2359–61, 53 L.Ed.2d 320 (1977).

ities); *Texports Stevedore Co. v. Winchester, supra,* 554 F.2d 245 (5th Cir. 1977) (maintenance and repair of longshoring tools and equipment); *Alabama Dry Dock & Shipbuilding Co. v. Kininess, supra,* 554 F.2d at 176 (5th Cir. 1977) (maintenance and repair of shipbuilding equipment). *See also Trotti & Thompson v. Crawford, supra,* 631 F.2d 1214 (5th Cir. 1980) (no distinction under the Act between pier construction and pier repair).

■ The scaffolding work at issue in the present case was part of an ongoing pier repair project involving the repair of a turntable (affixed to the pier) used by longshoremen in the loading and unloading of ships. Under the authority of the cases cited in the preceding paragraph, that project was indisputably maritime in nature.

Hullinghorst contends, however, that the present case is distinguishable from those "maintenance and repair" cases. Hullinghorst argues that Carroll was to play no *direct* role in the actual repair work on the turntable. Thus, Carroll was not engaged in the maintenance or repair of longshoring equipment, but was merely utilizing his essentially nonmaritime carpentry skills to build a scaffold that would be used by others in the repair of longshoring equipment.

We do not choose to split this particular hair. Carroll's work in erecting the scaffolding was an integral part of an indisputably maritime pier repair project, an essential and indispensable step in the repairs to be effected. It was not merely "incidental" to that project, *see Dravo Corp. v. Banks,* 567 F.2d 593, 595–96 (3d Cir. 1977) (unskilled laborer spreading salt on ice at shipyard not engaged in maritime employment), nor was it the type of job "peripherally related to maritime matters that Congress said was not to be covered by the LHWCA, such as trans-shipment of stored cargo or clerical work," *see Odom Construction Co. v. United States Dep't of Labor, supra,* 622 F.2d at 113. It was an integral step in a maritime project of the type that could be performed by a typical harborworker. *See*

*id.* at 112. It directly furthered the maritime goals of the Wyandotte port facility—the loading and unloading of ships. *See Trotti & Thompson v. Crawford, supra,* 631 F.2d at 1220. It clearly bore a "realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters' . . . ." *Odom Construction Co. v. United States Dep't of Labor, supra,* 622 F.2d at 113. That the skills utilized by Carroll were "essentially nonmaritime" in character is immaterial. It is the purpose of the work that is the key; "nonmaritime" skills applied to a maritime project *are* maritime for purposes of the "maritime employment" test of the Act. *Mississippi Coast Marine v. Bosarge,* 637 F.2d 994, 997–98 & n.7 (5th Cir. 1981); *Trotti & Thompson v. Crawford, supra,* 631 F.2d at 1221 nn.15, 16. *See Odom Construction Co. v. United States Dep't of Labor, supra,* 622 F.2d at 112–13.

■ Nevertheless, Hullinghorst contends that the present case differs from the previous "maintenance and repair" cases of this circuit in yet another important respect: Hullinghorst, unlike the employers in those earlier decisions, is not shown to have had any maritime involvement other than that arising from the disputed activity of the claimant in this action. In sum, Hullinghorst argues that the cases granting coverage fall into three general categories: (1) Those granting coverage to *longshoremen* injured while performing some segmented portion of the longshoring operation to the landward side of the cargo's first point of rest; (2) those granting coverage to workers whose overall *employment* was indisputably maritime, but who were injured while performing allegedly nonmaritime tasks; and (3) those granting coverage to workers injured while performing "borderline" activities that directly furthered the indisputably maritime goals of their own employers. Thus, Hullinghorst argues, the maintenance and repair of longshoring equipment and port facilities falls within the scope of "maritime employment" only when the equipment or facilities are used by the claimant's own employer in some indisputably maritime operation.

Without disputing the accuracy of Hullinghorst's description of the factual situations that have previously arisen in this circuit, we nevertheless conclude that the Act imposes no such restriction. A very similar argument was raised in the *Odom Construction Co.* case in the context of the Act's situs requirement. There, the employer contended that the phrase "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel" meant that the situs requirement was satisfied only if the site of the injury were used by the claimant's own employer for one of the indisputably maritime activities mentioned in the Act. This court rejected that argument:

> Odom's suggestion that coverage would be available only if it, the employer, used the mooring blocks is both an inappropriately strained reading of the statute and contrary to the overall Congressional intent. The stated limitation is cast in terms of *an* employer, not *the* employer or *the claimant's* employer. A more reasoned interpretation is that the site must be used by a statutory employer. It is clear from the record and the findings below that Domtar Salt, which uses the blocks as an integral part of its facilities for loading salt onto barges, is a statutory employer.

> In addition, it seems clear to us that the phrase "customarily used by an employer ..." was inserted to ensure that an employer could be liable only when it had real or constructive notice that an area was used for maritime purposes and was therefore likely to be a covered situs. This notice function would not be aided substantially by requiring the claimant's employer to be the customary user, as illustrated by the fact that Odom makes no claim here that it did not know about Domtar's use of the site.

> Moreover, the appellant's interpretation would open up a significant loophole in the LHWCA since there would be no coverage if the customary user of an area simply hired various independent contractors on a short-term basis to perform the necessary work. (The individual independent contractors presumably would not qualify as customary users.) This gap in coverage would be especially large if the limiting language applies to all shore-side sites. Such a result would be inconsistent with the professed Congressional intention for exclusive uniform coverage. Thus we accept the findings below that Maze was injured in a situs covered under 33 U.S.C. § 903(a).

*Odom Construction Co. v. United States Dep't of Labor, supra,* 622 F.2d at 114–15 (footnote omitted).

For similar reasons we reject the selfsame argument here raised in the context of the Act's status requirement. To be sure, the degree to which an employer is involved in maritime operations independently of the disputed activities of the injured claimant is a factor—and often a substantial factor—to be considered in determining whether the claimant is himself engaged in "maritime employment" within the meaning of the Act. *See, e. g., Trotti & Thompson v. Crawford, supra,* 631 F.2d at 1221–22. It is not, however, a necessary prerequisite to a finding of such employment. *See, e. g., Boudloche v. Howard Trucking Co., supra,* 632 F.2d 1346 (5th Cir. 1980). Nothing in the language of the Act, however, would suggest a requirement that an employee injured in what would otherwise be considered maritime employment would nevertheless be barred from recovery because his employer was performing functions that were an integral part of indisputably maritime activity that was conducted by *another,* and not by the employer itself. Indeed, so to hold would read into the *status* requirement the very restriction rejected from the *situs* requirement in *Odom Construction Co., supra.*

As this court noted in *Odom,* Congress intended that liability should be imposed only where the employer had real or constructive notice of the likelihood of coverage. Where, as here, an employer assigns his workers to a project that is maritime in nature (pier repair) and that is conducted on a maritime situs (a pier), he has sufficient notice of the likelihood of coverage.

This notice function would not be enhanced by requiring the injured claimant's employer to be the customary user of the maritime worksite or the ultimate beneficiary of the repairs. Furthermore, acceptance of Hullinghorst's position in this regard would open up the very loophole the *Odom* panel sought to close, by encouraging the use of "nonmaritime" independent contractors to perform segmented portions of maritime repair projects such as the one in question here. Such a result is no less inconsistent with the professed congressional intent to provide uniform coverage when it arises in the context of the *status* requirement than when it arises in the context of the *situs* requirement. Indeed, the policy of liberal construction of the Act counsels strongly against allowing the segmentation of maritime operations and the use of independent contractors to defeat coverage where otherwise it would clearly lie.

We conclude that Carroll was engaged in maritime employment at the time of his injury, and that he is therefore a covered employee within the meaning of the Act.

### b. "Employer" status.

■ Hullinghorst also argues that a second independent prerequisite to coverage under the Act is lacking in the present case: Hullinghorst does not qualify as a statutory "employer" within the meaning of § 902(4).

As defined in § 902(4), a statutory "employer" is "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the naviga-

ble waters of the United States [as described in 33 U.S.C. § 903(a)]." (*See* note 5.) That definition has remained essentially unchanged since the original passage of the Act in 1927.[7]

Prior to the 1972 amendments to the Act, the notion of a separate and independent "employer" status requirement had some significance in the coverage scheme. Under the predecessor 1927 Act, coverage was extended on the basis of *situs* only—thus, a claimant injured upon the navigable waters of the United States (as then defined) would be eligible for the Act's compensation, even though he was not himself engaged in maritime employment, so long as his employer had at least one worker who was so employed. *See Northeast Marine Terminal Co., Inc. v. Caputo, supra,* 432 U.S. at 264–65, 97 S.Ct. at 2357.

With the addition of the "employee" status requirement in the 1972 amendments, however, the "employer" status requirement of the old Act has been rendered largely tautological. Now the injured claimant must himself be engaged in maritime employment. Thus, as this court noted in *Jacksonville Shipyards, Inc. v. Perdue, supra,* 539 F.2d at 538 n.9, if the injured claimant meets the status and situs requirements embodied in § 903(a) and § 902(3), his employer would automatically qualify as a statutory "employer" within the meaning of § 902(4); if the claimant fails to meet either of those requirements, then it is immaterial whether the employer would qualify as a statutory "employer" or not.[8]

---

7. The definition of "employer" contained in § 902(4) was changed in the 1972 amendments to the Act so as to reflect the expanded definition of "navigable waters of the United States" incorporated by those amendments into § 903(a). *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 264 n.23, 97 S.Ct. 2348, 2357 n.23, 53 L.Ed.2d 320 n.23 (1977).

8. We find no decision of this circuit which holds that "employer" status may not be predicated upon the status of the injured claimant as a maritime employee under the Act. Pre-amendment cases are to the contrary. *See e.*

*g., Nalco Chemical Corp. v. Shea,* 419 F.2d 572, 574 (5th Cir. 1969).

Indeed, there is some question as to the existence of a separate and independent "employer" status requirement, as a jurisdictional confine, at all. *See Trotti & Thompson v. Crawford,* 631 F.2d 1214, 1216 n.5 (5th Cir. 1980). The only case expressly recognizing such a requirement (since the enactment of the 1972 amendments) is *Alford v. American Bridge Div., U. S. Steel Corp.,* 642 F.2d 807, 810–11 (5th Cir. 1981) (petition for rehearing pending), which did not discuss the requirement in any depth.

Accordingly, having determined that Carroll was engaged in maritime employment upon the navigable waters of the United States at the time of his injury, we conclude that it necessarily follows that Hullinghorst, his employer, is a statutory "employer" within the meaning of the Act.

### III. *Connexity Between Injury and Disability*

Hullinghorst's final contention is that the Board erred in upholding the ALJ's finding that a causal relationship existed between the injury and Carroll's subsequent disability.

As we have noted, the findings and inferences of the ALJ are conclusive upon the Board unless they are irrational, unsupported by substantial evidence in the record as a whole, or inconsistent with the law; and our review of the Board's determination is limited to reviewing for legal error and to ascertaining that the Board adhered to its statutory standard in its own review of the facts. *Presley v. Tinsley Maintenance Service, supra,* 529 F.2d at 436. *See* 33 U.S.C. § 921(b)(3).

■ Our examination of the record reveals substantial evidence to support the ALJ's conclusion that Carroll's disability resulted from his injury at the Wyandotte port facility on December 12, 1972.

Carroll testified that he felt something "pop" in his lower back while lifting material at his jobsite on December 12, and that he has suffered severe pain and restricted mobility from that moment on. Prior to that date, he experienced no symptoms whatsoever. Since that date, he has been totally unable to work.

Carroll was examined on December 22, 1971, by Dr. Stephen M. Wilson, an orthopedic surgeon, and on January 11, 1973, by Dr. William L. Fisher, Jr., a neurosurgeon. Both doctors testified that Carroll reported subjective symptoms, but that physical examinations and a myelogram revealed no objective evidence of the herniated disc

from which his disability arises. Both doctors testified, however, that falsely normal results were possible in such cases, and Dr. Fisher indicated that up to fifteen percent of myelograms might show falsely normal results. Neither physician could rule out the possibility that a herniated disc existed at that time.

Carroll testified that he continued to suffer pain and restricted mobility, and that he consulted Dr. Jack F. Loupe, an orthopedic surgeon, on September 14, 1973. Dr. Loupe's initial examination revealed the herniated disc. Carroll subsequently underwent surgery for the problem on three occasions. Dr. Loupe testified that, assuming the accuracy of the history related by Carroll, it was his opinion that the entire sequence of back problems suffered by Carroll was caused initially by the injury that occurred on December 12.

Dr. Ira L. Hewitt, a specialist in internal medicine consulted by Dr. Loupe in connection with Carroll's surgery, began treating Carroll for a heart condition in September of 1973. Dr. Hewitt testified that the heart condition could have been precipitated by the stress, anxiety, and pain attendant to the kind of injury described by Carroll.

■ Hullinghorst does not contend that this evidence is insufficient to support the ALJ's conclusion. Instead, it argues that the ALJ erred in placing greater weight on the testimony of Carroll and Drs. Loupe and Hewitt than on the testimony of Drs. Wilson and Fisher. In essence, Hullinghorst's position is that the medical testimony relied upon by the ALJ is less credible than the medical testimony tending to counter it. Such an argument fails by reason of the applicable limitations upon judicial review, if for no other reason. The ALJ is not bound to accept the opinion of any particular medical expert; he is entitled to weigh the medical evidence—including the relative credibility of the competing experts—and to draw from that evidence the inferences he deems most reasonable in light of the evidence as a whole and the

---

We do not doubt that an injured claimant's employer must be an "employer" as that term is defined in the statute. We simply note that, in the context of the 1972 amendments, it does

not represent the sort of "jurisdictional confine" that is embodied in the *situs* and "employee" *status* requirements.

**760**

common sense of the situation. *Todd Ship-yards Corp. v. Donovan*, 300 F.2d 741, 741–42 (5th Cir. 1962). As this court noted in *Presley, supra*:

> That the facts may permit diverse inferences is immaterial. The administrative law judge alone is charged with the duty of selecting the inference which seems most reasonable and his choice, if supported by the evidence, may not be disturbed.

*Presley v. Tinsley Maintenance Service, supra*, 529 F.2d at 436.

We find in the record no basis for disturbing the factual findings and inferences drawn by the ALJ that Carroll's disability—arising from a herniated disc and a heart condition—resulted from the injury he suffered on the Wyandotte pier on December 12, 1972.

### Conclusion

We find no legal error in the determination of the Benefits Review Board that claimant David E. Carroll suffered a disabling injury while engaged in maritime employment. Accordingly, the Board's award of federal compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, is AFFIRMED.

AFFIRMED.